Ronald L. Israel, Esq.
Abigail J. Remore, Esq.
Chiesa Shahinian & Giantomasi PC
ONE BOLAND DRIVE
WEST ORANGE, NJ 07052
Telephone: 973.325.1500
Facsimile: 973.325.1501
Email: risrael@csglaw.com; ajremore@csglaw.com
*Attorneys for Plaintiff Megaforce Records, Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MEGAFORCE RECORDS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> TIMOTHY MCMURTRIE and KENNETH BALLONE <br><br> Defendants. | Civil Action No.: <br><br> *Document Electronically Filed* <br><br> **COMPLAINT** <br><br> **Jury Trial Demanded** |

Plaintiff, Megaforce Records, Inc. (hereinafter "Megaforce" or "Plaintiff"), with an address of 900 Broadway, New York, New York 10003, by and through its attorneys, for its complaint against defendants, Timothy McMurtrie, with an address of 14 Summit Avenue, Garfield, New Jersey 07026 (hereinafter "McMurtrie"), and Kenneth Ballone, with an address of 13012 Exinite Drive, Reno, Nevada 89506 (hereinafter "Ballone" and, together with McMurtrie, the "Defendants"), alleges as follows:

## NATURE OF ACTION

1.     This is an action under the trademark and service mark laws of the United States, specifically 15 U.S.C. § 1051 et seq. (hereinafter "Lanham Act'), the statutes and common law of the State of New Jersey and the common law of the State of New York

seeking: (a) a permanent injunction prohibiting Defendants from utilizing the M.O.D. name and mark and all related intellectual property; (b) damages, litigation costs and fees, including attorney's fees, as a result of Defendants' unfair competition with Plaintiff; and (c) to bar the registration of U.S. Trademark Application Serial No. 87/435,143.

## THE PARTIES

2.      Plaintiff Megaforce is a corporation duly organized and existing under the laws of the State of New York with its principal place of business located in New York, New York.

3.      Defendant McMurtrie is an individual with an address of 14 Summit Avenue, Garfield, New Jersey 07026.

4.      Defendant Ballone is an individual with an address of 13012 Exinite Drive, Reno, NV 89506.

5.      Upon information and belief, defendants are partners in a joint business venture in connection with attempting to release musical recordings and provide live musical performances under the marks M.O.D. (METHOD OF DESTRUCTION) and/or M.O.D. CLASSIC.

## JURISDICTION, VENUE AND STANDING

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338 and the trademark laws of the United States, 15 U.S.C. § 1051 et seq.  This Court also has supplemental jurisdiction over Plaintiff's claims that arise under the laws of the State of New Jersey and New York pursuant to 28 U.S.C. §§ 1338(b) and 1367.

7.      This Court has personal jurisdiction over the parties to this action because: (a) Plaintiff's claims arise in this judicial district; (b) Defendant McMurtrie resides in this judicial district; (c) Defendant Ballone has intentionally interacted with individuals, municipalities and

organizations in this judicial district, including by partnering with McMurtrie, a New Jersey resident, for the business activities that are the subject of this action; (d) each party does business in this judicial district; (e) Plaintiff's claims are related to Defendants' contacts with this judicial district; (f) Defendants have purposefully availed themselves of the privilege of conducting activities within the State of New Jersey and in this judicial district; and (g) in light of the forgoing, the exercise of personal jurisdiction over Defendants in this judicial district comports with traditional notions of fair play and substantial justice.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because: (a) Plaintiff's claims arise in this judicial district and as a result of Defendants' purposefully availing themselves of the privilege of conducting activities within this judicial district; (b) each party does business in this judicial district; (c) witnesses and evidence are located in this judicial district; (d) certain acts complained of herein have taken place in this judicial district; and (e) Defendants are subject to this judicial district's personal jurisdiction with respect to this action.

9.      Plaintiff has standing to bring this action pursuant to 15 U.S.C. § 1125(a)(1), the statutory and common laws of the State of New Jersey and the common laws of the State of New York.

## FACTUAL ALLEGATIONS

10.      Plaintiff is an independent record label founded in 1982, best known for publishing and distributing the works of numerous world famous heavy metal musical artists.

11.      Plaintiff is the current owner of all right, title and interest in and to the names and marks M.O.D. METHOD OF DESTRUCTION, M.O.D., MOD and METHOD OF

DESTRUCTION.   Plaintiff acquired these rights from William John Massie (hereinafter "Massie"), via written assignment dated April 13, 2018.

12.     Massie is a renowned musician originally from Englewood, New Jersey, and is known worldwide professionally as Billy Milano, the lead singer of and driving force behind the celebrated hardcore/metal crossover band M.O.D. METHOD OF DESTRUCTION (hereinafter "M.O.D.").

13.     Billy Milano and his band M.O.D., which has been in existence for over thirty years and released eight albums, are celebrated as pioneers of the hardcore/metal crossover genre.

14.     M.O.D.'s first four studio albums – (i) U.S.A. for M.O.D. (1987); (ii) Surfin' M.O.D. (1988); (iii) Gross Misconduct (1989); and (iv) Rhythm of Fear (1992) were released by Plaintiff.

15.     M.O.D.'s greatest hits album – Loved by Thousands, Hated by Millions (1995) – and most recent studio album – Busted, Broke & American (2017) – were also released on the Megaforce label.

16.     Plaintiff helped to originate M.O.D. and is the owner of the majority of the M.O.D. catalog.

17.     In approximately 1984, Massie, along with Rob Kabula, formed the band M.O.D.  Mr. Kabula is no longer involved with M.O.D.

18.     On January 30, 1987, Massie (under the name Billy Massie) and his then-current M.O.D. bandmates, Defendants and Keith Davis, entered into an Exclusive Artist's Recording Agreement with Plaintiff, a copy of which (with the social security numbers of the signatories redacted) is attached hereto as Exhibit A (hereinafter the "Agreement").

4

19.     Among numerous other terms, the Agreement states that following the departure of any member from M.O.D., the name and mark M.O.D. METHOD OF DESTRUCTION "shall remain the property of those members of the Group who continue to perform their obligations [under the Agreement] and whose engagements are not terminated."

20.     M.O.D's first studio album, U.S.A. for M.O.D., was recorded and released in 1987 on the Megaforce label and featured Massie and both Defendants, along with Keith Davis. Of those four people, only Massie remains a member of M.O.D. and he, together with various new members that he has assembled over the years, have continuously performed and released music as M.O.D.  The other three members from the lineup on U.S.A. for M.O.D. last recorded and performed with M.O.D. long ago.

21.     Massie was originally and is currently the lead singer of M.O.D.

22.     Massie has also occasionally served as the guitarist and bassist of M.O.D. at various times throughout its thirty-five year history.

23.     After the release of U.S.A. for M.O.D. in 1987, both Defendants were asked to leave M.O.D.

24.     Ballone only performed two shows with M.O.D. after the release of U.S.A. for M.O.D., did not participate in the tour to promote that album, and has not been affiliated with M.O.D. in any way for over thirty years.

25.     McMurtrie was briefly permitted to rejoin M.O.D. in 1992 and appeared on M.O.D.'s fourth album, Rhythm of Fear.  McMurtrie did not tour with M.O.D. to promote Rhythm of Fear, and, shortly after the release, was again asked to leave M.O.D.

26.     McMurtrie has not been affiliated with M.O.D. in any way for seventeen years.

27.     Since Defendants' departure from M.O.D. in 1987 (and following McMurtrie's brief failed reunion with the band in 1992), Massie continued to consistently: (i) release music as M.O.D. and under the name and mark M.O.D. METHOD OF DESTRUCTION; (ii) perform as M.O.D. and under the name and mark M.O.D. METHOD OF DESTRUCTION; and (iii) sell musical recordings and merchandise bearing the M.O.D. METHOD OF DESTRUCTION mark through the present, at first on his own and now as Plaintiff's licensee.

28.     For over the last thirty years, Massie, together with other band members who have changed constantly over time, has been consistently and continuously releasing music and performing as M.O.D. and utilizing the M.O.D. METHOD OF DESTRUCTION mark throughout the United States and the world.  Defendants have not been members of M.O.D. for any of these recordings or performances since at least as early as 1988, with the exception of McMurtrie's brief failed reunion for a single studio album in 1992.

29.     Since the inception of the band, Massie has been the lead vocalist, front man and creative leader of M.O.D., wrote many of M.O.D.'s most well-known songs and controlled the nature and quality of the band's goods and services.  Following Defendants' departures from the band, Massie continued to be the front man, vocalist and creative leader of M.O.D., and controlled the nature and quality of the band's goods and services in the United States and around the world without either of Defendants' participation, involvement or input.

30.     Since Defendants' initial departures from the band, M.O.D. has released eight albums, has continuously and consistently performed many shows throughout the United States and elsewhere throughout the world and has performed in front of hundreds of thousands of fans.  Massie and M.O.D. have also sold merchandise bearing the M.O.D. METHOD OF DESTRUCTION mark at or in connection with all of these performances.  Each album, concert

6

and performance has its own publicity and promotional material which includes the M.O.D. METHOD OF DESTRUCTION mark and each is widely advertised and promoted.

31.     On April 13, 2018, Massie assigned all right, title and interest in and to the names and marks M.O.D. METHOD OF DESTRUCTION, M.O.D., MOD and METHOD OF DESTRUCTION (collectively, the "Megaforce Marks"), along with the right to recover damages and profits and all other remedies for past and future infringements of said marks, to Plaintiff.   A copy of the assignment agreement is attached hereto as Exhibit B.

32.     Massie continues to use the Megaforce Marks as an authorized licensee of Plaintiff, which now, together with Massie, controls the nature and quality of the band's goods and services in the United States and around the world.

33.     The Megaforce Marks are widely recognized by the relevant consuming public in the United States and are synonymous with the musical group featuring Massie.   When concert-goers attend an M.O.D. show or purchase an M.O.D. album, they do so with high expectations, and look forward to enjoying a particular kind of music and experience.   Without Massie's involvement as the lead vocalist/front man, the audience would not get the experience it expects.

34.     Plaintiff (and Massie before it) has invested substantial time, money and other resources in connection with the provision of goods and services under the Megaforce Marks, as well as the advertising, promotion and marketing of goods and services provided under the Megaforce Marks.   As a result, the Megaforce Marks have acquired substantial consumer recognition as the band led by Massie and the music, live performances and merchandise associated with M.O.D. and Plaintiff.   Plaintiff's efforts have resulted in the generation of an extensive amount of goodwill in the Megaforce Marks, and the Megaforce Marks have become

exceedingly valuable assets of Plaintiff. The fame and popularity of the Megaforce Marks were evident when Massie and M.O.D. performed at the 2014 Hellfest festival in France before 90,000 fans.

35.     The Megaforce Marks are inherently distinctive for musical recordings, entertainment services and related merchandise.

36.     As a result of all of the foregoing, Plaintiff, by and through its assignor, Massie, has common law rights in and to the Megaforce Marks dating back to the band's inception in 1984. Prior to assigning such common law rights to Plaintiff, Massie controlled and exercised those common law rights for at least the last thirty years without any involvement from Defendants (excluding the brief failed reunion with McMurtrie seventeen years ago that lasted for only a single studio album). Plaintiff continues to utilize the Megaforce Marks on its own and through its authorized licensee, Massie.

37.     Long after Ballone's departure from the band in or around the year 1988 (and resulting relinquishment of rights in the name and mark M.O.D. METHOD OF DESTRUCTION in accordance with the Agreement) and long after McMurtie's most recent departure from the band in or around the year 1992 (and resulting relinquishment of rights in the name and mark M.O.D. METHOD OF DESTRUCTION in accordance with the Agreement), and following the many years that Massie and his other band members continued releasing music and performing as M.O.D. and utilizing the Megaforce Marks without any involvement from Defendants whatsoever, Defendants filed an intent-to-use based service mark application, Serial No. 87/435,143 directed to the mark M.O.D. (METHOD OF DESTRUCTION) for *Audio and video recordings featuring music and artistic performances; Digital media, namely, pre-recorded DVDs, downloadable audio and video recordings, and*

8

*CDs featuring and promoting music and musical performances; Downloadable MP3 files and MP3 recordings featuring Musical and artistic performances; Musical sound recordings; Musical video recordings; Phonograph records featuring music* in International Class 9.

38.     Neither Massie nor Plaintiff gave consent or approval to Defendants to file any trademark or service mark application directed to the mark M.O.D. (METHOD OF DESTRUCTION) or any variation thereof.

39.     In fact, in 2017, prior to assigning his rights to Plaintiff, Massie objected to Defendants' actions, asked that they abandon their trademark application and agree not to use the mark that did not belong to them.  Defendants refused.  Since acquiring the Megaforce Marks, Plaintiff has continued such objection.

40.     In spite of Plaintiff's objections, Defendants are marketing and selling and/or are preparing to market and sell goods, including merchandise and musical recordings, bearing the marks M.O.D. (METHOD OF DESTRUCTION) and/or M.O.D. CLASSIC.

41.     Defendants are also giving live musical performances and/or are preparing to give live musical performances in the near future under the marks M.O.D. (METHOD OF DESTRUCTION) and/or M.O.D. CLASSIC.

42.     Since M.O.D.'s inception, the only constant for the band has been Massie – one of the band's founders, its leader and its front man.  Simply put, without Massie, there would be no M.O.D.  Massie's continuous and consistent use of the name and mark M.O.D. METHOD OF DESTRUCTION after Ballone's and McMurtrie's departures from the band in approximately 1988 and after McMurtrie's brief failed reunion with the band seventeen years ago for a single studio album establishes common law rights (which have been duly assigned to

Plaintiff) that have priority over and are superior to Defendants' filing date for the instant intent-to-use based application.

43.     Massie also had superior (and the only) rights in and to the name and mark M.O.D. METHOD OF DESTRUCTION in accordance with the Agreement, which rights have been duly assigned to Plaintiff, and Defendants' claimed ownership in and use of the marks M.O.D. (METHOD OF DESTRUCTION) and M.O.D. CLASSIC are in direct violation of the Agreement.

44.     On June 16, 2017, Massie filed his own trademark application, Serial No. 87/493,541 for the mark M.O.D. METHOD OF DESTRUCTION in Class 9 for *Series of musical sound recordings; downloadable musical sound recordings; musical video recordings; downloadable musical video recordings; audiovisual recordings; downloadable audiovisual recordings.* On September 15, 2017, an Office Action was issued in connection with that application that, among other things, cited Defendants' application No. 87/435,143 as a potential bar to registration of Opposer's mark. On April 13, 2018, that application was also duly assigned to Plaintiff.

## COUNT I

### UNFAIR COMPETITION UNDER THE LANHAM ACT

45.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-44 of the Complaint as though fully set forth herein.

46.     Defendants are or will be selling goods and/or providing services in interstate commerce under marks that are confusingly similar to the Megaforce Marks.

47.     Defendants are also advertising goods and services under marks that are confusingly similar to the Megaforce Marks.

48.     Defendants' current and anticipated future use of the marks M.O.D. (METHOD OF DESTRUCTION) and M.O.D. CLASSIC, in which Plaintiff has superior rights, is likely to cause confusion or mistake and/or to deceive in violation of 15 U.S.C. § 1125(a).

49.     Defendants' current and anticipated future use of the marks M.O.D. (METHOD OF DESTRUCTION) and M.O.D. CLASSIC, in which Plaintiff has superior rights, in advertising or promoting goods or services misrepresents the nature, characteristics, and qualities of Defendants' goods, services and commercial activities as those originating from Plaintiff and its licensee.

50.     Defendants have committed or will commit such acts of false designation of origin and false description and representations willfully and with full knowledge of Massie's prior use and superior rights in the Megaforce Marks, which rights have been duly assigned to and inure to the benefit of Plaintiff.

51.     As a result of Defendants' acts of unfair competition, Plaintiff has suffered and will continue to suffer serious and irreparable harm for which there is no adequate remedy at law.

## COUNT II

### COMMON LAW UNFAIR COMPETITION

52.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-51 of the Complaint as though fully set forth herein.

53.     Defendants' aforesaid acts constitute infringement of Plaintiff's rights in the Megaforce Marks and tend to falsely describe or represent that Defendants' goods or services are provided by, or sponsored by, or approved by, or licensed by, or affiliated with or are in some other way legitimately connected to Plaintiff and are of the same character, nature and

quality as the goods and services that have been provided by Plaintiff and its assignor and licensee since 1984, thereby damaging Plaintiff, Plaintiff's reputation and the goodwill associated with and value in the Megaforce Marks.

54.     Defendants' aforesaid acts have caused and will cause actual consumer confusion between Defendants' marks and the Megaforce Marks.

55.     Defendants' aforesaid acts have caused and will cause a likelihood of consumer confusion between Defendants' marks and the Megaforce Marks.

56.     Defendants' aforesaid acts were committed and are being committed willfully, maliciously and in bad faith.

57.     Defendants' aforesaid acts constitute acts of unfair competition against Plaintiff under the common law of the States of New Jersey and New York, which acts have been committed knowingly, willfully and in bad faith and have injured Plaintiff in its trade and business.

58.     As a result of Defendants' acts of unfair competition, Plaintiff has suffered and will continue to suffer serious and irreparable harm for which there is no adequate remedy at law.

<u>**COUNT III**</u>

**UNFAIR COMPETITION UNDER N.J.S.A. § 56:4-1**

59.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-58 of the Complaint as though fully set forth herein.

60.     Defendants' unauthorized current and anticipated future use of the marks M.O.D. (METHOD OF DESTRUCTION) and M.O.D. CLASSIC, which are confusingly similar to the Megaforce Marks in which Plaintiff has superior rights, falsely indicates that

Defendants are connected with, sponsored, endorsed, authorized, approved by or affiliated with Plaintiff, which they are not.

61.     Defendants' unauthorized current and anticipated future use of the marks M.O.D. (METHOD OF DESTRUCTION) and M.O.D. CLASSIC is likely to cause confusion, mistake or deception as to the source or affiliation of Defendants' goods and/or services.

62.     Defendants' unauthorized current and anticipated future use of the marks M.O.D. (METHOD OF DESTRUCTION) and M.O.D. CLASSIC allows Defendants to receive the benefit of the goodwill to which they are not entitled in the Megaforce Marks that Plaintiff and its assignor have built up at great labor and expense over the last decades.

63.     Defendants' aforesaid acts constitute unfair competition in violation of the New Jersey Unfair Competition Statute (N.J.S.A. § 56:4-1) and the common law of the State of New Jersey.

64.     Defendants' aforesaid acts were committed and are being committed willfully and maliciously.

65.     As a result of Defendants' actions, Defendants are being unjustly enriched.

66.     As a result of Defendants' acts complained of herein, Plaintiff has been harmed in an amount to be determined at trial and will continue to be harmed and will suffer irreparable injury unless Defendants are enjoined from the foregoing actions.

## COUNT IV

### REFUSAL TO REGISTER APPLICATION SERIAL NO. 87/435,143 AS DEFENDANTS ARE NOT THE RIGHTFUL OWNERS OF THE MARK

67.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-66 of the Complaint as though fully set forth herein.

68.    In accordance with the Agreement, Defendants are not the rightful owners of the M.O.D. (METHOD OF DESTRUCTION) mark.

69.    Defendants have never possessed ownership of the M.O.D. (METHOD OF DESTRUCTION) mark or any of the Megaforce Marks or any variation thereof.  To the extent Defendants ever had any claim to a partial interest in the M.O.D. band name, such interest (if any) was initially abandoned, in accordance with the Agreement and the common law, in approximately 1988 when Defendants first left M.O.D.  While only McMurtrie's rights (if any) could have conceivably been briefly revived when he rejoined the band in 1992, his rights (if any) were not revived as his failed reunion with the band lasted no more than a single studio album, following which McMurtrie left M.O.D. for the final time.

70.    Defendants were not the owners of the M.O.D. (METHOD OF DESTRUCTION) mark pursuant to Section 1 of the Lanham Act, 15 U.S.C. §1051 at the time Application Serial No. 87/435,143 was filed.

71.    Defendants are not currently the owners of the M.O.D. (METHOD OF DESTRUCTION) mark pursuant to Section 1 of the Lanham Act, 15 U.S.C. §1051.

72.    Plaintiff will be damaged by the registration sought by Defendants because such registration would support and assist Defendants in the confusing and misleading use of the M.O.D. (METHOD OF DESTRUCTION) mark sought to be registered and will give color of exclusive statutory rights to Defendants in violation and derogation of the prior and superior rights of Plaintiff.

73.    Plaintiff will be further damaged by the registration sought by Applicants as such registration, if granted, may bar the registration of its Application No. 87/493,541.

74.     Defendants are not entitled to registration of the M.O.D. (METHOD OF DESTRUCTION) Mark pursuant to Section 1 of the Lanham Act, 15 U.S.C. §§ 1051, and thus Application Serial No. 87/435,143 must be denied registration.

## COUNT V

### REFUSAL TO REGISTER APPLICATION SERIAL NO. 87/435,143 ON THE GROUND OF LIKELIHOOD OF CONFUSION

75.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-74 of the Complaint as though fully set forth herein.

76.     Defendants' intent to use the nearly identical M.O.D. (METHOD OF DESTRUCTION) mark in connection with the Class 9 goods identified in Application Serial No. 87/435,143 is likely to (i) cause confusion, mistake and/or to deceive; and (ii) cause damage to Plaintiff and the consuming public.  Should Application Serial No. 87/435,143 be permitted to mature into a registration, and should Defendants begin using the M.O.D. (METHOD OF DESTRUCTION) mark in connection with the goods identified therein, consumers are likely to believe that Defendants' goods are provided by, or approved by, or affiliated with, or in some other way legitimately connected to Plaintiff and/or its licensee.

77.     The mark that is the subject of Application Serial No. 87/435,143 is nearly identical and confusingly similar to the Megaforce Marks, such that the registration of Application Serial No. 87/435,143 would be inconsistent with, and damaging to, Plaintiff's prior common law rights in and to the Megaforce Marks.

78.     Plaintiff has priority of use in connection with the Megaforce Marks by virtue of Massie's earlier, consistent and continuous use of said mark over the date that Application Serial No. 87/435,143 was filed or any other date that can be established by Applicants in

15

connection with the subject mark, Massie's subsequent assignment of such rights to Plaintiff and Plaintiff's continued use of such marks on its own and through its licensee.

79.     Plaintiff, on its own and through its licensee, provides goods identical to the goods Defendants intend to provide in connection with Application Serial No. 87/435,143, which will undoubtedly lead to consumer confusion in the marketplace.

80.     Plaintiff will be damaged by the registration sought by Defendants because such registration would support and assist Defendants in the confusing and misleading use of the M.O.D. (METHOD OF DESTRUCTION) mark sought to be registered and will give color of exclusive statutory rights to Defendants in violation and derogation of the prior and superior rights of Plaintiff.

81.     Plaintiff will be further damaged by the registration sought by Applicants as such registration, if granted, may bar the registration of its Application No. 87/493,541.

82.     Defendants are not entitled to registration of the M.O.D. (METHOD OF DESTRUCTION) Mark pursuant to Section 2(d) of the Lanham Act, 15 U.S.C. §1052(d), and thus Application Serial No. 87/435,143 must be denied registration.

## COUNT VI

### INJUNCTION

83.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-82 of the Complaint as though fully set forth herein.

84.     Plaintiff will be irreparably harmed if Defendants are not enjoined from using the marks M.O.D. (METHOD OF DESTRUCTION), M.O.D. CLASSIC and the Megaforce Marks or any confusingly similar variation thereof in connection with the provision of any goods and services.

85.     Plaintiff does not have an adequate remedy at law for Defendants' ongoing misconduct, and entry of an injunction will serve the public interest.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff demands judgment in its favor and against the Defendants as follows:

1.     Permanently enjoining and restraining Defendants and their affiliates, agents and representatives from, directly or indirectly: (a) using the Megaforce Marks or any marks similar thereto in connection with any goods or services; and (b) otherwise competing unfairly with Plaintiff or its affiliates in any manner;

2.     Ordering Defendants to pay to Plaintiff compensatory damages in an amount to be determined at trial for the injuries sustained by Plaintiff in consequence of the unlawful acts alleged herein;

3.     Ordering Defendants to pay to Plaintiff consequential damages in an amount to be determined at trial;

4.     Ordering Defendants to pay to Plaintiff punitive damages in an amount to be determined at trial;

5.     Ordering Defendants to pay to Plaintiff all of Plaintiff's litigation expenses, including but not limited to reasonable attorney's fees and the costs of this action;

6.     Barring the registration of U.S. Trademark Application Serial No. 87/435,541; and

7.     Awarding Plaintiff such other and further relief as the Court may deem just and proper.

CHIESA SHAHINIAN & GIANTOMASI PC
*Attorneys for Plaintiff Megaforce Records, Inc.*

By: _____
RONALD L. ISRAEL
Chiesa Shahinian & Giantomasi PC
One Boland Drive
West Orange, New Jersey 07052
973-325-1500
risrael@csglaw.com

Dated:  August 14, 2019

## **JURY DEMAND**

Plaintiff demands trial by jury of all claims and defenses in this action so triable.

CHIESA SHAHINIAN & GIANTOMASI PC
*Attorneys for Plaintiff Megaforce Records, Inc.*

By:   /s/ *Ronald L. Israel*
      RONALD L. ISRAEL

Dated:  August 14, 2019

## **LOCAL RULE 11.2 CERTIFICATION**

I certify that the parties to this complaint are also parties to a pending proceeding before the Trademark Trial & Appeal Board of the United States Patent and Trademark Office, Opposition Proceeding No. 91236950.  William John Massie, along with Plaintiff, is a co-opposer in that proceeding brought against both Defendants in the instant case.  Upon the filing of the instant Complaint, Plaintiff will be seeking to suspend that proceeding pending the resolution of the instant action.  I certify that, apart from Opposition Proceeding No. 91236950, this matter is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding; no other action, arbitration or administrative proceeding is contemplated to my knowledge; and I know of no other parties who should be joined in this action at this time.

CHIESA SHAHINIAN & GIANTOMASI PC
*Attorneys for Plaintiff Megaforce Records, Inc.*

By:   /s/ *Ronald L. Israel*
      RONALD L. ISRAEL

Dated:  August 14, 2019

# EXHIBIT A

## EXCLUSIVE ARTIST'S RECORDING AGREEMENT

This Agreement made and entered into as of this 30th day of January, 1987 by and between MEGAFORCE RECORDS, INC. of 63-64 Brunswick Woods Drive, East Brunswick, New Jersey 08816 ("COMPANY") and Billy Milano, Tom McMurtrie, Ken Balone and Keith Davis p/k/a "Method of Destruction", c/o Billy Milano, 456 Tappan Road, North Vale, New Jersey 07647 (jointly and severally referred to herein as "ARTIST")

1. (a) COMPANY hereby engages ARTIST'S exclusive personal services as a recording artist in connection with the production of records and ARTIST hereby accepts such engagement and agrees to exclusively render such services for COMPANY during the term hereof and all extensions and renewals.

(b)  The rights herein granted to COMPANY and the obligations of ARTIST shall be for the world ("Territory").

2.  The term of this Agreement shall be for an initial period of one (1) year commencing on the date hereof ("Initial Period").  ARTIST hereby grants to COMPANY four (4) consecutive separate options to extend the term for further periods of one (1) year each ("Option Periods"), each upon the same terms and conditions applicable to the Initial Period, except as otherwise hereinafter set forth.  The Initial Period and every Option Period for which COMPANY has exercised its options are hereinafter sometimes referred to together as the "Term".  Each option shall be deemed automatically exercised unless COMPANY shall give written notice to the contrary to ARTIST at least thirty (30) days prior to the date the Term would otherwise expire.

3. (a)  During the Initial Period and each Option Period, ARTIST shall record and deliver to COMPANY masters the equivalent in playing time of one (1) LP.  At COMPANY'S election, which election may be made, if at all, at any time prior to the expiration of the Initial Period and any applicable Option Year, ARTIST shall record and deliver to COMPANY additional masters provided that such additional masters shall not exceed the equivalent in playing time of three (3) LPs during the Term hereof, nor shall ARTIST be required to record and deliver more than two (2) LPs in any contract period hereof.

(b)  The masters recorded hereunder by ARTIST shall be recorded in a recording studio selected or approved by COMPANY and ARTIST at such times as COMPANY may designate or approve, subject to ARTIST'S prior professional commitments provided that said commitments do not interfere with the timely delivery of phonograph records to COMPANY.  Each master delivered hereunder shall consist of ARTIST'S newly recorded studio performance of material selected or approved by COMPANY and ARTIST and not previously recorded by ARTIST.  Each master shall be subject to COMPANY'S reasonable approval as commercially satisfactory.  ARTIST shall deliver to COMPANY a two-track stereo tape for each master.  Each master shall be completed,

fully edited and mixed prior to delivery to COMPANY, in the proper form for the production of the parts necessary for the manufacture of commercial phonograph records. Upon the request of COMPANY, ARTIST shall re-record any selection until a master satisfactory to COMPANY shall have been obtained. Each master shall be delivered to COMPANY at a place designated or approved by COMPANY.

(c)   The first LP required to be delivered during the Initial Period or any Option Period shall be delivered to COMPANY within three (3) months following COMPANY'S request therefor. The additional masters (if any) required to be delivered during the Intial Period or any Option Period shall be delivered to COMPANY within sixty (60) days following COMPANY±S request therefor and such request shall be made at least ninety (90) dyas prior to the end of the current contract period. It is understood that ARTIST shall not deliver any LP within six (6) months from the date of delivery of a prior LP. Notwithstanding anything to the contrary contained in this Agreement, COMPANY shall have no less than one hundred twenty (120) days following the date of ARTIST'S delivery to and acceptance by COMPANY in accordance with all of the terms and conditions of this Agreement of all of the masters required to be recorded and delivered during any contract Period within which to exercise the immediately succeeding option to extend the Term pursuant to Paragraph 2 hereof and then current Period of the Term and the times for the exercise by COMPANY of its options to extend the Term pursuant to Paragraph 2 hereof and the date(s) of the commencement of subsequent Periods shall be deemed extended accordingly.

(d)   If, at any time during the Term hereof, COMPANY'S distrubuting record company terminates its agreement with COMPANY and does not elect to cause ARTIST to record directly for such distributing record company (the "Event"), COMPANY shall have a period of ninety (90) days following the event to secure a comparable agreement with a major, national record distribution company with respect to ARTIST'S services. If COMPANY is unable to secure such a replacement agreement as aforesaid, ARTIST may terminate the Term hereof by giving COMPANY written notice to such effect within thirty (30) days following such ninety (90) day period. This agreement shall be suspended for such ninety (90) day period, except for the payment of any royalties due ARTIST.

4.   ARTIST warrants and agrees that:

(a) During the Term, ARTIST shall not perform for the purpose of making records for anyone other than COMPANY and shall not authorize the use of ARTIST'S name, likeness, or other identification for the purpose of distributing, selling, advertising or exploiting records in the Territory for anyone other than COMPANY.

(b)   ARTIST shall not perform any selection recorded hereunder for the purpose of making records for anyone other than COMPANY (i) for a period of five (5) years after the initial date of de;overu to COMPANY respective record containing such selection or (ii) for a period of two (2) years after the expiration or other termination of this agreement, whichever is later ("Re-recording Restriction").

-2-

(c)   Should ARTIST make any sound recordings during the Term for motion pictures, television, electrical transcriptions or any other medium or should ARTIST after the Term perform for any such purpose any selection recorded hereunder to which the Re-recording Restriction then applies, ARTIST will do so only pursuant to a written agreement prohibiting the use of such recordings, directly or indirectly, for record purposes.   ARTIST shall furnish to COMPANY a copy of the provisions of any such contract relating to the foregoing.

5.   All masters recorded by ARTIST during the Term from the inception of the recording thereof and all reproductions derived therefrom together with the performances embodied thereon, shall be the property of COMPANY for the world free from any claims whatsoever by ARTIST or any person deriving any rights or interests from ARTIST. Without limiting the generality of the foregoing, COMPANY and its designee(s) shall have the exclusive and unlimited rights to all the results and proceeds of ARTIST'S services as a recording artist rendered during the Term, including, but not limited to, the exclusive, unlimited and perpetual rights throughout the world:

(a)   To manufacture, advertise, sell, lease, license, distribute or otherwise use or dispose of, in any or all fields of use by any method now or hereafter known, records embodying the masters subject hereto, all of the terms and conditions of this Agreement;

(b)   Subject to ARTIST'S prior approval of same, to use and publish, and to permit others to use and publish, ARTIST'S name (including any professional name heretofore or hereafter adopted by ARTIST), photographs, portrait, likeness, and biographical matter concerning ARTIST for advertising and trade purposes solely in connection with all masters recorded by ARTIST and all Pictures produced during the Term.   The foregoing shall not be deemed to convey to COMPANY so-called "merchandising" rights;

(c)   To obtain copyrights and renewals thereof in sound recordings (as distinguished from the musical compositions embodied thereon) recorded by ARTIST during the Term, in COMPANY'S name as owner and employee-for-hire of such sound recordings;

(d)   To release records embodying the performance to be recorded hereunder under any name, trademark or label which COMPANY or its subsidiaries, affiliates or licensees may from time to time elect, provided that all such records shall be initially released on COMPANY'S or the Distribution Company's "top pop label";

(e)   To perform the records publicly and to permit public performances thereof by means of radio broadcast, television or any other method now or hereafter known.

6.   (a)   ARTIST acknowledges that the sale of records is speculative and agrees that the judgment of COMPANY with regard to any matter affecting the sale, distribution and exploitation of such records shall be binding and conclusive upon ARTIST.   Except as otherwise

-3-

expressly provided in subparagraph 6(b) hereof, nothing contained in this Agreement shall obligate COMPANY to make, sell, license, or otherwise distribute records manufactured from masters subject hereto.

(b) Provided ARTIST is not in breach of this Agreement, and if COMPANY is in receipt of the completed, fully edited and mixed satisfactory masters sufficient to comprise each newly-recorded required LP hereunder embodying ARTIST'S newly-recorded required stuido performance of material not previously recorded by ARTIST ready for COMPANY'S manufacture of records therefrom, together with all materials therefor, COMPANY agrees to commercially release each LP delivered hereunder in the United States within one hundred twenty (120) days following delivery to and COMPANY'S acceptance of the applicable LP.

(c) It is understood and agreed that if COMPANY shall have failed to so release any such LP in the United States, ARTIST shall have the right to notify COMPANY in writing of COMPANY'S such failure and of ARTIST'S desire that the Term of this Agreement be terminated if COMPANY does not, within ninety (90) days after COMPANY receives such notice from ARTIST, commercially release the applicable LP in the United States, it is specifically understood and agreed that if COMPANY shall fail to fulfill any such release committment, COMPANY shall have no liability whatsoever to ARTIST, and ARTIST'S only remedy shall be to terminate the Term of thisAgreement by written notice to COMPANY within fifteen (15) days following the expiration of such ninety (90) day period.

7.   (a)   With respect to each contract period herein, COMPANY agrees to provide for ARTIST'S benefit as an advance, inclusive of all advances, if any, payable to ARTIST, all other artists and Producers, against and recoupable from all royalties otherwise payable to ARTIST hereunder the following:

(i)   A recording fund for the initial LP-master to be delivered hereunder ("Recording Fund") of Fifteen Thousand Dollars ($15,000) and a Recording Fund for each subsequent LP-master to be delivered hereunder equal to sixty percent (60%) of the royalties earned by ARTIST in connection with the net retail sales (to be computed prior to deduction of reserves, as that term is later defined herein) of albums solely embodying the immediately preceding LP-master delivered hereunder sold through COMPANY'S regular channels of distribution in the USA, to be computed in good faith as of the last day of the month immediately preceding delivery of the LP-master for which the particular recording fund is being established, provided that the aforementioned recording fund shall not be less than (minimum") nor greater than "maximum") the amounts set forth below with respect to each LP recorded during the applicable contract period:

| Contract Period | Minimum | Maximum |
|---|---|---|
| First Option Period | $ 30,000 | $ 45,000 |
| Second Option Period | $ 35,000 | $ 50,000 |
| Third Option Period | $ 45,000 | $ 60,000 |
| Fourth Option Period | $ 60,000 | $ 75,000 |

-4-

(ii)   Within fourteen (14) days following delivery to and acceptance by COMPANY of each applicable LP=master, and provided all invoices and bills of all Recording Costs incurred with respect to the applicable LP-master are furnished to Company, Company agrees to pay YOU as an advance against and recoupable from royalties, if any, which are due or become due hereunder the difference between the Recording Costs and the balance of the respective Recording Fund.

(b)   All recording costs incurred in excess of the applicable approved Recording Cost Budget shall be ARTIST's sole responsibility and ARTIST hereby agrees to forthwith pay and discharge all such excess costs.   In the event COMPANY agrees to pay any such excess costs on ARTIST's behalf, ARTIST shall, upon demand, reimburse COMPANY for such excess costs or COMPANY may deduct such excess costs from any and all monies (other than mechanical royalties) due to ARTIST underthis Agreement.   All recording costs paid by COMPANY shall be deemed to be advances against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this Agreement except for mechanical royalties.

(c)   In the event COMPANY shall request ARTIST to record and deliver masters consisting of less than an LP and ARTIST consents, such consent not to be unreasonably withheld, the advance otherwise payable for such masters shall be computed by multiplying the applicable advance for the first LP required to be delivered hereunder by a fraction, the numerator of which is the number of masters which COMPANY requests and the denominator of which is eight (8).

(d)   With respect to payments to be made on delivery, COMPANY shall have the right to withhold, for a maximum period of forty-five (45) days following delivery, a reasonable portion thereof to provide for anticipated costs which have not yet been paid by COMPANY or billed to COMPANY which costs are otherwise deductible from payments to be made to ARTIST.

(e)   All monies paid to ARTIST on behalf of ARTIST pursuant to ARTIST's written request or to fulfill a legal obligation of COMPANY to or on behalf of any person, firm or corporation representing ARTIST, other than royalties payable pursuant to Paragraph 10 of this Agreement, shall constitute advances recoupable from any monies payable under this agreement, except for mechanical royalties, unless COMPANY shall otherwise consent in writing.

8.   ARTIST shall be solely responsible for and shall pay all monies becoming payable to all third parties rendering services or otherwise in respect of the production of recordings derived from masters subject to this Agreement.

9.   Each master subject hereto shall be produced by a producer selected by ARTIST and approved by COMPANY.   ARTIST shall be solely responsible for and shall pay all monies becoming payable to such producer.   In the event COMPANY, pursuant to ARTIST'S request, elects to pay any such producer directly, all such sums so paid by

-5-

COMPANY shall be deducted from any and all monies (except mechanical royalties and/or recording budgets forsubsequent LPs) otherwise payable to ARTIST under this agreement. ARTIST and COMPANY hereby approve SCOTT IAN and ALEX PERIALES as the individual producers of the first album to be recorded hereunder. ARTIST hereby directs COMPANY and COMPANY hereby agrees to deduct and pay to each such individual producer, the royalty of one (1%) percent and a fee of One Thousand Dollars. The foregoing royalty shall be paid to the individual producers when COMPANY has recouped all recording costs hereunder (including the individual producer's fee). At the net royalty payable to ARTIST and following such recoupment the individual producer's royalty shall be calculated retroactively to the first record sold thereafter.

10. Conditioned upon ARTIST'S full and faithful performance of each and all of the material terms hereof, COMPANY shall pay ARTIST the following royalties in respect of records subject to this Agreement:

(a) (A) (i) A royalty of nine (9%) percent in respect of retail sales in the United States of Singles and Maxi-singles derived from masters recorded and delivered during the Term;

(ii) The royalty rate hereinabove set forth in subparagraph 10(a)(A)(i) shall be hereinafter referred to as the "Basic U.S. Singles Rate".

(B) (i) A royalty of Twelve (12%) percent in respect of retail sales in the United States of LPs derived from masters recorded and delivered during the Term;

(ii) The royalty rates hereinabove set forth in subparagraph 10(a)(B)(i) shall be hereinafter referred to as a "Basic U.S. LP Rate".

(iii) In the event any LP distributed by an independent distributor and which solely embodies newly-recorded studio performances required to be recorded and delivered in the Initial Period or the First Option Period hereinunder shall have net sales through normal retailer channels in the United States in excess of 50,000 royalty-bearing copies, the applicable Basic U.S. LP Rate shall be increased by one (1%) percent, but only with respect to those net sales through normal retailer channels in the United States in excess of 50,000 royalty-bearing copies of such LP.

(iv) In the event any LP distributed by an independent distributor and which solely embodies newly-recorded studio performances required to be recorded and delivered during the Term hereof shall have net sales through normal retailer channels in the United States in excess of 250,000 royalty-bearing copies, the applicable Basic U.S. LP Rate shall be increased by an additional one-half (1/2%) percent, but only with respect to those net sales (through normal retailer channels in the United States) in excess of 250,000 royalty-bearing copies of such LP.

(v)   In the event any LP distributed by an independent distributor and which solely embodied newly-recorded studio performances required to be recorded and delivered during the Term hereof shall have net sales through normal retailer channels in the United States in excess of 500,000 royalty bearing copies. The applicable basic U.S. LP rate shall be increased by an additional one-half (1/2%) percent, but only with respect to those net sales through normal retailer channels in the United States in cecess of 500,000 royalty-bearing copies of such LP.

(b)   (A)   (i)   With respect to retail sales of Singles and Maxi-singles outside the United States in those territories where the Distribution Company has a wholly-owned affiliate which itself manufactures and distributes records, the royalty rate shall be two-thirds (2/3) of the applicable Basic U.S. LP Rate.

(ii)   With respect to the retail sales of Singles and Maxi-singles outside the United States and outside those territories referred to in subparagraph 10(b)(A)(i) above the royalty rate shall be one-half (1/2) of the Basic U.S. Singles Rate.

(iii)   The royalty rates hereinabove set forth in subparagraphs 10(b)(A)(i) and (ii) shall each be hereinafter referred to as a "Basic Foreign Singles Rate".

(B)   (i)   With respect to retail sales of LPs outside the United States in those territories where the Distribution Company has a wholly-owned affiliate which itself manufactures and distributes records, the royalty rate shall be two-thirds (2/3) of the applicable Basic U.S. LP Rate.

(ii)   With respect to retail sales of LPs outside the United States and outside those territories referred to in subparagraph 10(b)(B)(i) above, the royalty rate shall be one-half (1/2) of the applicable Basic U.S. LP Rate.

(iii)   The royalty rates hereinabove set forth in subparagraphs 10(b)(B)(i) and (ii) shall each be hereinafter referred to as a "Basic Foreign LP Rate".

(C)   (i)   Notwithstanding anything to the contrary contained herein, with respect to records sold in Brazil, Greece, Portugal, India, Kenya, Zambia, Zimbabue, Nigeria and any other territory in which governmental or other authorities place limits on the royalty rates permissible for remittances to the United States in respect of records sold in such territory(ies), the royalty rate payable to ARTIST hereunder in respect of sales of records in such territories shall equal the lesser of (A) the applicable Foreign Singles Rate or applicable Basic Foreign LP Rate, as the case may be or (B) the effective royalty rate permitted by such governmental or other authority for remittances to the United States less a royalty equivalent to two (2%) percent of the retail list price and such monies as COMPANY or its licensees shall be required to pay to all applicable union funds in respect of said sales.

(ii)    Royalties in respect of sales of records outside the United States shall be computed in the same national currency as COMPANY is accounted to by its licensees and shall be paid to ARTIST at the same rate of exchange as COMPANY is paid. It is understood that such royalties will not be due and payable until payment thereof is received by COMPANY (or credited to COMPANY'S account) in the United States of America. In the event COMPANY is unable to receive the payment in United States dollars in the United States due to governmental regulations, royalties therefor shall not be credited to ARTIST'S account during the continuance of such inability except that (I) if any accounting rendered to ARTIST hereunder during the continuance of such inability shows ARTIST'S account to be in a credit position, COMPANY will, after ARTIST'S request and at ARTIST'S expense, if COMPANY is able to do so, deposit such royalties to ARTIST'S credit in the applicable foreign currency in a foreign depository, or (II) if the royalties not credited to ARTIST'S account exceed the amount, if any, by which ARTIST'S account exceed the amount, if any, by which ARTIST'S account is in a debit position, then COMPANY will, after ARTIST'S request and at ARTIST'S expense, and if COMPANY is able to do so, deposit such excess royalties to ARTIST'S credit in the applicable foreign currency in a foreign depository. Deposit as aforesaid shall fulfill COMPANY'S obligations under this Agreement as to record sales to which such royalty payments are applicable.

(c)    With respect to records sold (i) through any direct mail or mail order distribution method, including, without limitation, record club distribution, (ii) by distribution through retail outlets in conjunction with special advertisements on radio or television, or (iii) by any combination of the methods set forth above, the royalty payable in connection therewith shall be the lesser of (A) one-half (1/2) of COMPANY'S net earned royalty receipts in respect of reported sales through such channels or (B) one-half (1/2) of the Basic U.S. Singles Rate, applicable Basic U.S. LP Rate, applicable Basic Foreign Singles Rate or applicable Basic Foreign LP Rate, as the case may be. No royalties shall be payable with respect to records given away as "bonus" or "free" records as a result of joining a record club or plan or of purchasing a required number of records with respect to records received by members of any such club operation either in an introductory offer in connection with joining such club or upon recommending that another join such club operation, provided, however, that for thepurpose hereof, the number of non-royalty bearing club records shall not exceed fifty (50%) percent of the total number of records distributed through such means.

(d)    (i)    With respect to mid-priced LPs, the royalty rate shall be two-thirds (2/3) of the applicable Basic U.S. LP Rate or applicable Basic Foreign LP Rate, as the case may be.

(ii)    With respect to budget LPs, the royalty rate shall be one-half (1/2) of the applicable Basic U.S. LP Rate or applicable Basic Foreign LP Rate, as the case may be.

(e)    With respect to EPs, the royalty rate shall be three-fourths (3/4) of the applicable Basic U.S. LP Rate or applicable Basic Foreign LP

Rate, as the case may be.

(f)   Notwithstanding anything to the contrary contained in this Agreement, in the event that COMPANY (or its licensee(s)') shall in any country(ies) of the Territory adopt a policy applicable to the majority of LP's in COMPANY'S (or its licensee(s)') then current catalogue pursuant to which the retail list price of an LP is reduced subsequent to its initial release, then the royalty rates otherwise payable to ARTIST under this Agreement shall be reduced in the proportion that such reduced retail list price of the applicable LP bears to the retail list price of such LP as initially released in the applicable country.

(g)   With respect to "compact-disc" LPs, the royalty rate shall be seventy-five (75%) percent of the applicable Basic U.S. LP Rate or applicable Basic Foreign LP Rate, as the case may be.

(h)   In the event that COMPANY shall sell or license third parties to sell "records" via telephone, satelite, cable or other direct transmission to the consumer over wire or through the air, ARTIST shall be paid royalties with respect thereto at the Basic U.S. Singles Rate, applicable Basic U.S. LP Rate, applicable Basic Foreign Singles Rate or applicable Basic Foreign LP Rate, as the case may be.  For purposes of calculating royalties payable in connection with such sales, the retail list price of such "records" shall be deemed to be the then-current retail list price of of tape copies of such records (but in the United States, eighty-five (85%) percent of the then current retail list price of such tape copies), and the packaging deduction for such sales shall be made in accordance with subparagraph 10(s)(iv) of this Agreement.

(i)   The royalty rate payable for records sold to the United States government, its subdivisions, departments and agencies, and to educational institutions and libraries shall be one-half (1/2) of the otherwise applicable basic U.S. rate and shall be based upon the retail list price (Post Exchange list price where applicable) of such records.

(j)   The royalty rate payable for records sold as "premiums" shall be one-half (1/2) of the Basic U.S. Singles Rate, applicable Basic U.S. LP Rate, applicable Basic Foreign Singles Rate or applicable Basic Foreign LP Rate, as the case may be, and the retail list price for such records shall be deemed to be COMPANY'S actual sales price.  It is understood that COMPANY shall not use ARTIST'S name or likeness in connection with any such "premium" record as an endorsement of any product or service, nor shall COMPANY release such "premium" record without ARTIST'S consent, such consent not to be unreasonably withheld.

(k)   The royalty rate payable for records sold in the form of pre-recorded tape (whether reel-to-reel or cartridge) or any other form (other than disc), shall be the applicable royalty rate otherwise payable, provided that if the retail list price of any record sold in pre-recorded tape form (or any form other than disc) shall be less than the retail list price of the corresponding record in disc form the royalty rate otherwise payable shall be reduced in the porportion that the retail list price of the applicable record in pre-recorded tape form (or such

form other than disc) bears to the retail list price of such record in disc form.

(l)  Following consultation with ARTIST, COMPANY shall have the right to license the masters to third parties for record use and/or all other types of use on a flat-fee basis.  COMPANY shall credit ARTIST'S ryyalty account with fifty (50%) percent of the net amount received by COMPANY under each such license.

(m)  As to records not consisting entirely of masters recorded and delivered hereunder, the royalty rate otherwise payable to ARTIST hereunder with respect to sales of any such record shall be provided by multiplying such royalty rate by a fraction, the numerator of which is the number of masters recorded and delivered hereunder embodied on such record and the denominator of which is the total number of masters embodied thereon.  Not withstanding the foregoing, during each year of the term hereof, COMPANY shall not cross-couple more than two (2) masters embodying ARTIST'S performances hereunder with masters embodying the performances of other artists on one (1) record for release in the United States without ARTIST'S consent, except for use in so-called "best of", "greatest hits", "sampler" or similar type albums.  Outside the United States, COMPANY shall have the right to cross-couple masters hereunder as it so desires.

(n)  As to masters embodying performance of ARTIST together with the performances of another artist or artists, the royalty rate otherwise payable hereunder with respect to sales of any record delivered from any such master and other recording costs and/or advances otherwise payable by COMPANY hereunder with respect to any such master shall be prorated by multiplying such royalty rate or recording costs and/or advances by a fraction, the numerator of which is one and the denominator of which is the total number of artists whose performances are embodied on such master.

(o)  COMPANY shall have the right to include or to license others to include any one or more of the masters in promotional records on which such masters and other recordings are included, which promotional records are designed for sale at a price which is at least fifty (50%) percent lower than the regular price of COMPANY'S LPs.  No royalties shall be payable on sales of such promotional records and COMPANY shall consult with ARTIST prior to any such licensing.

(p)  No royalties shall be payable in respect of: (i) records given away or furnished on a "no-charge" basis to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with COMPANY, provided that such records actually given away do not exceed 300 non-royalty bearing Singles out of every 1,000 Singles distributed and 150 non-royalty bearing LP's and of every 1,000 LP's distributed and provided further that COMPANY shall have the right to exceed the aforesaid limitation for short term special promotions or marketing companies.  The number of records distributed on a no-charge basis shall not, for any such short term promotion or campaign exceed an additional ten (10%) percent of the total number of records

-10-

distrubuted;  (ii) records given away or sold at below stated wholesale prices for promotional purposes to disc jockeys, record reviewers, radio and television stations and networks, motion picture companies, music publishers, COMPANY'S employees, ARTIST or other customary recipients of promotional records or for use on transportation facilities; (ii) records sold as scrap, salvage, overstock or "cut-outs"; (iv) records sold below cost.  No royalties shall be payable on any sales by COMPANY'S licensees until payment or credit has been received by COMPANY in the United States.

(q)  As to records sold at a discount to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with the Distribution Company in lieu of the records given away or furnished on a "no-charge" basis as provided in subparagraph 10(p)(i) above, the applicable royalty rate otherwise payable hereunder with respect to such records shall be reduced in the proportion that said discount wholesale price bears to the usual stated wholesale price.

(r)  The royalty rates provided for in this Paragraph 10 shall be applied against the retail list price (less COMPANY'S container deductions, excise taxes, duties and other applicable taxes) for ninety (90%) percent of the records sold which are paid for and not returned. The term "retail list price" as used in this Agreement shall mean (i) for records sold in the United States, the manufacturer's suggested retail price in the United States and (ii) for records sold outside the United States, the manufacturer's suggested retail price in the country of manufacture or sale, as COMPANY is paid.  In Those countries where a manufacturer's suggested retail price is not utilized or permitted, the generally accepted retail price shall be utilized.  Notwithstanding the foregoing with respect to sales in the United States, the retail list price for a "Maxi-single" shall be deemed to be the lesser of (1) one hundred seventy five (175%) percent of the retail list price of a Single or, (2) the actual retail list price of such "Maxi-single".

(s)  COMPANY'S container deductions shall be a sum equal to: (i) ten (10%) percent of the retail list price for records in disc form (other than "compact disc" records), (ii) twelve and one-half (12-1/2%) percent of the retail list price for records in disc form in "double-fold" jackets or covers or in jackets which contain an insert of any other special elements, (iii) twenty-five (25%) percent of the retail list price for "compact-discs", and (iv) twenty (20%) percent of the retail list price for pre-recorded tape and cartridge boxes or containers, or any other form of package, container or box other than as described herein.

11.  Statements as to royalties payable hereunder shall be sent by COMPANY to ARTIST within sixty (60) days after the expiration of each calendar quarter for the preceding quarterly period ending February 28, May 31, August 31 or November 30.  Concurrently with the rendition of each statement, COMPANY shall pay ARTIST all royalties shown to be due by such statement, after deducting all recording costs paid by COMPANY, all payments made on behalf of ARTIST and all advances made to ARTIST prior to the rendition of the statement.  COMPANY shall make available for ARTIST'S inspection and copying, extracts of the accounting

-11-

statements received by COMPANY from its distributing record company
which pertain solely to ARTIST.  No statements need be rendered by
COMPANY for any such quarterly period after the expiration of the Term
hereof for which there are no sales of records derived from masters
hereunder nor any reserves to be liquidated.  All payments shall be
made to the order of ARTIST and shall be sent to ARTIST at ARTIST'S
address first above written.  COMPANY shall be entitled to maintain a
single account with respect to all recordings subject to this agreement.
COMPANY may maintain reasonable reserves, however, COMPANY agrees
that regarding such reserves: (1) with respect to LPs in disc form, each
base reserve as initially established shall not exceed twenty (20%)
percent of records shipped during the applicable accounting period and
shall, at the end of two (2) years from the date established, be reduced
to five (5%) ercent; (ii) with respect to LPs in tape form, each base
reserve as initially established shall not exceed twenty-five (25%) percent
of tapes shipped during the applicable accounting period and shall, at
the end of two (2) years from the date established, be reduced to ten
(10%) percent; and (iii) with respect to Singles, each base reserve as
initially established shall not exceed thirty-five (35%) of records shipped
during the applicable accounting period and shall, at the end of two (2)
years from the date established, be reduced to ten (10%) percent.
COMPANY shall fully liquidate each base reserve within four (4) years
from the date such base reserve was established.  At such time as a
reserve is liquidated, it shall be deemed to be a sale in the period in
which it was liquidated.  ARTIST shall be deemed to have consented to
all accountings rendered by COMPANY hereunder and said accountings
shall be binding upon ARTIST and shall not be subject to any objection
by ARTIST for any reason unless specific objection, in writing, stating
the basis thereof, is given to COMPANY withi8n eighteen (18) months
after the date rendered, and after such written objection, unless suit is
instituted within one (1) year after the date upon which COMPANY
notifies ARTIST that it denies the validity of the objection.

    12.  ARTIST shall have the right at ARTIST'S sole cost and expense
to appoint a Certified Public Accountant who is not then currently
engaged in an outstanding audit of COMPANY to examine COMPANY'S books and
records as same pertain to sales of records subject herein as to which
royalties are payable hereunder, provided that any such examination shall
be for a reasonable duration and shall take place at COMPANY'S offices
during normal business hours on reasonable prior written notice and shall
not occur more than once in any calendar year. In the event that ARTIST'S
certified public accountant is actually engaged in an outstanding audit
of COMPANY for a third party the time period within which such certified
public accountant must commence such audit shall not be deemed to run
during the audit performed for such third party.  COMPANY will pay to
ARTIST, ARTIST'S share of any sums secured by COMPANY as a result
of COMPANY±S audit of the distributing record company.

    13.  (a)  All notices to ARTIST must be served upon ARTIST
personally, by prepaid telegram, or by depositing the same, postage
prepaid, by registered or certified mail, return receipt requested,
addressed to ARTIST at ARTIST'S address first above written with a

simultaneous copy sent to Elliot Cahn, Esq., Graham, Indursky and Schindler, P.C., 5315 College Avenue, Oakland, California 94618.

(b)   All notices to COMPANY must be in writing and must be sent postage prepaid by registered or certified mail, return receipt requested, to COMPANY'S address first above written with a simultaneous copy sent in the same manner to Michael S. Toorock, Esq., 605 Third Avenue, New York, New York 10158.

14.   (a)   All musical compositions or material recorded pursuant to this Agreement which are written or composed, in whole or in part, or owned or controlled, directly or indirectly, by ARTIST or any individual member of ARTIST or any producer of the masters subject hereto (herein called "Controlled Compositions") shall be and are hereby licensed to COMPANY for the United States, at a royalty per selection equal to seventy-five (75%) percent of the minimum statutory per selection rate (without regard to playing time) effective on the date of commencement of recording of the masters concerned. If COPMPANY secures a more favorable mechanical royalty rate from the Distribution Company, the mechanical royalty rate payable to ARTIST shall be increased in the same manner. The aforesaid seventy-five (75%) percent per selection rate shall hereinafter sometimes be referred to as the "Per Selection Rate". Notwithstanding the foregoing, the maximum aggregate mechanical royalty rate which COMPANY shall be required to pay in respect of any Single, Maxi-single or LP hereunder, regardless of the total number of all compositions contained therein, shall not exceed two (2) times, and ten (10) times the Per Selection Rate, respectively, and in respect of any EP hereunder, regardless of the total number of all compositions contained therein, shall not exceed the Per Selection Rate times the total number of masters contained therein. In this connection, it is specifically understood that in the event that any Single, Maxi-single, EP or LP contains other compositions in addition to the Controlled Compositions and the aggregate mechanical royalty rate for said Single, Maxi-single, EP or LP shall exceed the applicable maximum aggregate mechanical royalty rate for the Controlled Composition contained thereon shall be reduced by the aforesaid excess over said applicable maximum aggregate mechanical royalty rate. In the event ARTIST advises COMPANY of its desire to record a composition other than a Controlled Composition and the mechanical royalty payable for such composition results in exceeding the aforementioned aggregate mechanical royalty rate, COMPANY shall be responsible for 50% of such excess and ARTIST shall be responsible for 50% of such excess. Additionally, COMPANY shall have the right with respect to any Single, Maxi-single, EP or LP, the aggregate mechanical royalty rate provided in this subparagraph 14(a) to deduct such excess payable thereon from any and all monies payable to ARTIST pursuant to this or any other agreement. All mechanical royalties payable hereunder shall be paid on the basis of net records sold hereunder for which royalties are payable to ARTIST pursuant to this Agreement. Notwithstanding anything to the contrary contained herein, mechanical royalties payable in respect of Controlled Compositions for sales of records for any use other than as described in subparagraphs 10(a), (e), (g) and (k) hereof shall be seventy-five (75%) percent of the otherwise applicable Per Selection Rate. Controlled Compositions which

are arranged versions of any musical compositions in the public domain, when furnished by ARTIST for recording hereunder, shall be free of copyright royalties. Any assignment of the ownership or administration of copyright in any Controlled Composition shall be made subject to the provisions hereof and any inconsistencies between the terms of this Agreement and mechanical licenses issued to and accepted by COMPANY shall be determined by the Terms of this Agrteement. If any Single, Maxi-single, EP or LP contains other compositions in addition to the Controlled Compositions, ARTIST will obtain for COMPANY's benefit mechanical licenses covering such composition on the same terms and conditions applicable to Controlled Compositions pursuant tot his Paragraph 14.

     (b)   In respect of all Controlled Comp411 ositions performed in Pictures, (other than those intended for general theatrical distribution) COMPANY is hereby granted an irrevocable perpetual worldwide license to record and reproduce such Compositions in such Pictures and to distribute and perform such Pictures including, but not limited to, all Video shows thereof, and to authorize others to do so. COMPANY will not be required to make any payment in connection with those uses, and that license shall apply whether or not COMPANY receives any payment in connection with those Pictures. Simultaneously with ARTIST'S submission to COMPANY of the information required pursuant to subparagraph 22(c)(i) hereof, ARTIST shall furnish COMPANY with a written acknowledgement from the person(s) or entity(ies) controlling the copyright in each non-Controlled Composition to be embodied on any Picture confirming the terms upon which said person(s) or entity(ies) controlling the copyright in each non-Controlled Composition to be embodied on any Picture confirming the terms upon which said person(s) or entity(ies) shall issue licenses in respect thereof. Upon COMPANY'S request therefor, ARTIST shall cause said person(s) or entity(ies) to forthwith issue to COMPANY (and its designees) licenses containing said terms and such other terms and conditions as COMPANY (or its designees) may require. Royalties in connection with licenses for the use of non-Controlled Compositions pertaining to Pictures and Videotapes are included in the royalties set forth in subparagraph 20(d) hereof, as described in subparagraph 20(d)(ii). If the copyright in any Controlled Composition is owned or controlled by anyone else, ARTIST will cause that person, firm or corporation to grant COMPANY the same rights described in this Paragraph 14, on the same terms.

     (c)   Notwithstanding anything in the foregoing provisions of this Paragraph 14 to the contrary, if a particular selection recorded hereunder is embodied more than once in a particular record, COMPANY shall pay mechanical royalties in connection therewith at the applicable rate for such composition as though the selection was embodied thereon only once.

     (d)   The foregoing not withstanding in the event that records manufactured hereunder are distributed by an independent record distribution company, Controlled Compositions shall be deemed licensed to COMPANY at teh full statutory per selection rate, however, in no event shall such license exceed $.40 per LP.

-14-

15.   (a)   In the event that ARTIST for any reason fails to timely fulfill all of ARTIST"S recording and delivery commitments hereunder in accordance with all of the terms and conditions of this Agreement, then, in addition to any other rights or remedies which COMPANY may have, COMPANY shall have the right, upon written notice to ARTIST at any time prior to the expiration of the then current Period, (i) to terminate this Agreement without further obligation to ARTIST as to unrecorded or undelivered masters, OR (ii) to extend the then current Period of the Term for the duration of such default plus one hundred fifty (140) days with the times for the exercise by COMPANY of its options to extend the Term and the dates of commencement of subsequent Periods deemed extended accordingly.  It is specifically understood that COMPANY may exercise any or all of its rights pursuant to subparagraph 15(a)(i) and (ii) at any time(s) prior to the date the Term would otherwise expire.  COMPANY's obligations hereunder shall be suspended for the duration of any such default.  The provisions of this subparagraph shall not result in an extension of the Term for a period in excess of the period permitted by applicable law, if any, for the enforcement of personal service agreements.

b)   Nothing herein contained shall obligate COMPANY to permit ARTIST to record the minimum number of masters specified herein to be recorded during the Term hereof, it being understood that COMPANY'S sole obligation shall be to pay ARTIST an amount equal to the difference between the approved Recording Cost Budget for the LP which is not recorded and the recording costs incurred by ARTIST in recording and delivering the preceding LP immediately.

c)   COMPANY reserves the right, at its election, to suspend the operation of this Agreement for the duration of any of the following contingencies, if by reason of any such contingency, it is materially hampered in the performance of its obligations under this Agreement or its normal business operations are delayed or become impossible or commercially impracticable:   Act of God, fire, catastrophe, labor disagreement, acts of government, its agencies or officers, any order, regulation, ruling or action of any labor union or association of artists, musicians, composers or employees affecting COMPANY or the industry in which it is engaged, delays in the delivery of materials and supplies, or any other cause beyond COMPANY'S control.   Any such suspension due to a labor controversy which involves only COMPANY or the Distribution Company shall be limited to a period of six (6) months.   The foregoing rights of suspension shall not apply to COMPANY'S obligation to account and pay ARTIST unless the event creating such right of suspension directly affects COMPANY'S ability to prepare an accounting statement.

d)   If ARTIST'S voice or ARTIST'S ability to perform as an instrumentalist should be materially or permanently impaired, then in addition to any other rights or remedies which COMPANY may have, COMPANY shall have the right, upon written notice to ARTIST, to terminate this Agreement and shall thereby be relieved of any liability in connection with unrecorded masters.

-15-

16.   ARTIST expressly acknowledges that ARTIST'S services hereunder are of a special, unique and intellectual character which gives them peculiar value, and that in the event of a breach or threatened breach by ARTIST of any term, condition or covenant hereof, COMPANY will be caused immediate irreparable injury.   ARTIST expressly agrees that COMPANY shall be entitled to injunctive and other equitable relief, as permitted by law, to prevent a breach or threatened breach of this Agreement, or in any portion thereof, by ARTIST, which relief shall be in addition to any other rights or remedies, for damages or otherwise, available to COMPANY.

17.   (a)   ARTIST warrants and represents that ARTIST is under no disability, restriction or prohibition, whether contractual or otherwise, with respect to ARTIST'S right to execute this agreement and perform its terms and conditions.   Without limiting the foregoing, ARTIST specifically warrants and represents that no prior obligations, contracts or agreements of any kind undertaken or entered into by ARTIST will interfere in any manner with the complete performance of this Agreement by ARTIST or with ARTIST'S right to record any and all selections hereunder.   ARTIST warrants and represents that there are now in existence no prior unreleased masters embodying ARTIST'S performances.   ARTIST further warrants and represents that COMPANY shall not be required to make any payments of any nature for, or in connection with,   the rendition   of   ARTIST±S   services   or   the acquisition, exercise or exploitation of rights by COMPANY pursuant to this Agreement, except as specifically provided hereinabove.

(b)   ARTIST warrants and represents that no materials, or any use thereof, will violate any law or infringe upon or violate the rights of any third party.   "Materials" as used in this subparagraph 17(b) shall include: (i) all musical compositions and other materials contained on masters subject hereto, (ii) each name used by ARTIST, in connection with Masters recorded hereunder, and (iii) all other materials, ideas, other intellectual properties or elements furnished or selected by ARTIST and contained in or used in connection with any masters recorded hereunder or the packaging, sales, distribution, advertising, publicizing or other exploitation thereof.

(c)   ARTIST agrees to and does hereby indemnify, save and hold COMPANY harmless from any and all loss and damage (including court costs and reasonable attorneys' fees) arising out of, connected with or as a result of any inconsistency with, failure of, or breach or threatened breach by ARTIST of any warranty, representation, agreement, undertaking or covenant contained in this Agreement including, without limitation, any claim by any third party in connection with the foregoing which has been adjudicated by a court of competent jurisdiction or settled with ARTIST'S consent, such consent not to be unreasonably withheld.   In addition to any other rights or remedies COMPANY may have by reason of any such inconsistency, failure, breach, threatened breach or claim, ARTIST shall reimburse COMPANY, on demand, for any payment made by COMPANY at any time after the date hereof with respect to any loss, damage or liability resulting therefrom and in addition thereto COMPANY shall have the right to deduct from any and

-16-

all monies otherwise payable to ARTIST under this agreement a sum(s) equal to such loss, damage and liability (including anticipated and actual court costs and reasonable attorneys' fees) and shall hold any such amount(s) in an interest bearing account. COMPANY may not so withhold if ARTIST posts a bond which has been approved in all respects (form, amount, duration, surety, etc.) by COMPANY. COMPANY shall give ARTIST notice of any third party claim to which the foregoing indemnity applies and ARTIST shall have the right to participate in the defense of any such claim through counsel of ARTIST'S own choice and at ARTIST'S expense. Pending the determination of any such claim, COMPANY may withhold payment of all monies under this or any other agreement in any amount consistent with such claim. If no litigation is commenced within one (1) year following the assertion of any claim referred to above, COMPANY shall pay to ARTIST any sums withheld pursuant to this paragraph plus any accumulated interest.

18. Except as expressly set forth herein, wherever in this Agreement ARTIST'S approval or consent is required, such approval or consent shall not be unreasonably withheld. COMPANY may require ARTIST to formally give or withhold such approval or consent by giving ARTIST written notice requesting same and by furnishing ARTIST with the information or material in respect of which such approval or consent is sought. ARTIST shall give COMPANY written notice of approval or disapproval within seven (7) days after such notice. ARTIST shall not hinder nor delay the scheduled release of any record hereunder. In the event of disapproval or no consent, the reasons therefor shall be stated. Failure to give such notice to COMPANY as aforesaid shall be deemed to be consent or approval.

19. During the Term, ARTIST shall become and remain a member in good standing of any labor unions with which COMPANY may at any time have agreements requiring such union membership, including, but not limited to, the American Federation of Musicians and the American Federation of Television and Radio Artists. All masters subject hereto shall be produced in accordance with the rules and regulations of all unions having jurisdiction.

20. (a) In addition to ARTIST'S recording and delivery commitments as set forth in Paragraph 3 of this Agreement, ARTIST shall comply with requests, if any, made by COMPANY in connection with the production of Pictures. In this connection, and subject to ARTIST'S prior professional commitments ARTIST shall appear on dates and at places requested by COMPANY for the filming, taping or other fixation of audio-visual recordings. ARTIST shall perform services with respect thereto as COMPANY deems desirable in a timely and first-class manner. COMPANY shall not combine more than four (4) separate masters embodying artist's performances in one (1) Videoshow for commercial exploitation without first consulting with ARTIST. ARTIST acknowledges that the production of Pictures involves matters of judgment with respect to art and taste, which judgment shall be exercised by COMPANY in consultation with ARTIST but that COMPANY'S decisions with respect thereto shall be final.

(b)   (i)   Each Picture produced during the Term of the Agreement shall be owned by COMPANY (including the worldwide copyrights therein and thereto and all extensions and renewals thereof) to the same extent as COMPANY'S rights in master recordings made under this Agreement.

(ii)   COMPANY will have the unlimited right to manufacture Videoshows of the Picture and to rent, sell, distribute, transfer, sublicense or otherwise deal in such Videoshows under any trademarks, tradenames and labels to exploit the Picture by any means now or hereafter known or developed; or to refrain from any such exploitation, throughout the world.

(c)   (i)   Following COMPANY'S receipt of invoices therefor, COMPANY agrees to pay all costs actually incurred in the production of Pictures made at COMPANY's request hereunder, provided such costs have been previously approved by COMPANY in writing.   In this connection, prior to commencing production of any Picture, ARTIST shall submit to COMPANY, in writing, a detailed budget for each Picture.   Said budget shall include the following information:   (i) the musical compositions and other material to be embodied thereon; (ii) the general concept therefor and (iii) the producer, director and any other key personnel therefor. Following ARTIST'S receipt of COMPANY'S approval of said budget, ARTIST shall commence production of the Picture.   All costs incurred in excess of the applicable approved budget for reasons within ARTIST'S control, shall be ARTIST'S sole responsibility and ARTIST agrees to pay and discharge all such excess costs.   In the event COMPANY agrees to pay any such excess costs, same may be recouped from any and all monies due to ARTIST pursuant to this agreement.

(ii)   Fifty (50%) percent of the following sums, if any, paid by COMPANY in connection with each Picture shall be an advance against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this agreement, except mechanical royalties payable pursuant to Paragraph 14 hereof:

(A)   All expenses incurred by COMPANY in connection with the preparation and production of the Picture and the conversion of the Picture to Video Masters that are made to serve as prototypes for the duplication of the Videoshows of the Pictures;

(B)   All of COMPANY's direct out-of-pocket costs (such as for rights, artists (including ARTIST), other personnel, facilities, materials, services, and the use of equipment) in connection with all steps in the production of the Picture and the process leading to and including the production of such Video Masters (including, but not limited to, packaging costs and the costs of making and delivering duplicate copies of such Video Masters); and

(C)   If in connection therewith COMPANY furnishes any of its own facilities, materials, services or equipment for which COMPANY has a standard rate, the amount of such standard rate or if there is no standard rate, the market value for the services or thing

-18-

furnished.

(iii)   All sums that COMPANY in its sole discretion deems necessary or advisable to pay in connection with the production of Pictures and the exploitation of COMPANY's rights therein in order to clear rights or to make any contractual payments that are or may become due on the part of COMPANY, to ARTIST or any other person, firm or corporation by virtue of the exploitation of COMPANY's rights therein, in order to avoid, satisfy or make unnecessary any claims or demands by any person, firm or corporation claiming the right to payment therefor, including, but not limited to, any payment to an actual or alleged copyright owner, patent owner, union, union-related trust fund, pension plan or other entity, and any payment for an actual or alleged copyright owner, patent owner, union, union-related trust fund, pension plan or other entity, and any payment for an actual or alleged re-run fee, residual, royalty, license fee or otherwise shall constitute advances against and recoupable out of all royalties becoming payable to you pursuant to this or any other agreement.   No payment pursuant to this subparagraph 22(c)(iii) shall constitute a waiver of any ARTIST'S express or implied warranties and representations.

(d)   (i)   Conditioned upon ARTIST'S full and faithful performance of all of the terms and conditions of this Agreement, COMPANY shall pay ARTIST royalties equal to fifty (50%) percent of COMPANY's Video Net Receipts with respect to COMPANY's exploitation of Pictures subject to this Agreement.   Monies earned and received by COMPANY from any licensee (rather than monies earned and received by the licensee) in respect of exploitation of Pictures shall be included in the computation of Video Net Receipts.

(ii)   The royalties provided in subparagraph 22(d)(i) shall not include any royalty obligations COMPANY may have to any other person, firm or corporation who supplied services or rights used in connection with Pictures, including, without limitation,, procedures, directors, extras and any such royalties shall be deducted from the gross monies earned and received by COMPANY from the exploitation of Pictures.

(iii)   With respect to the audiovisual material embodying Pictures made hereunder together with other audiovisual materials, royalties payable to ARTIST shall be computed by multiplying the royalties otherwise applicable by a fraction, the numerator of which is the amount of playing time in such audiovisual material of Pictures made hereunder and the denominator of which is the total playing time of such audiovisual material.

(iv)   As to Pictures embodying performances of ARTIST together with the performances of another artist or artists, the royalties otherwise payable hereunder shall be prorated by multiplying such royalties by a fraction, the numerator of which is one and the denominator of which is the total number of artists whose performances are embodied on such Pictures.

-19-

(e)  COMPANY shall have the right to use and allow others to use each Picture for advertising and promotional purposes with no payment to ARTIST.  As used, herein, "advertising and promotional purposes" shall mean all uses (except commercial endorsements of a product or service) for which COMPANY receives no monetary consideration for licenses in excess of a reasonable amount as legal fees, administrative costs or similar type payments and as reimbursement for transaction costs incurred by COMPANY in connection with such uses, such as tape, duplication costs, shipping, handling and insurance costs.

(f)  (i)  During the Term of this Agreement, no person, firm or corporation other than COMPANY will be authorized to make, sell, broadcast or otherwise exploit audio-visual materials unless:  (i) ARTIST first notifies COMPANY of all of the material terms and conditions of the proposed agreement pursuant to which the audio-visual materials is to be made, sold, broadcast or otherwise exploited, including, but not limited to, the titles of the compositions covered by the proposed agreement, the format to be used, the manner of exploitation proposed and the identities of all proposed parties to the agreement, and (ii) ARTIST offers to enter into an agreement with COMPANY containing the same terms and conditions described in such notice and otherwise in the same form as this Agreement, but with payments to ARTIST that are ninety (90%) percent of the payments to ARTIST in such proposed agreement.  If COMPANY does not accept ARTIST'S offer within sixty (60) days after COMPANY'S receipt of same, ARTIST may then enter into that proposed agreement with the same parties mentioned in such notice, subject to subparagraph 22(f)(i) hereof and provided that such agreement is consummated with those parties within thirty (30) days after the end of that sixty (60) day period upon the same terms and conditions set forth in ARTIST'S notice and offer to COMPANY.  If that agreement is not consummated within the latter thirty (30) day period, no party except COMPANY will be authorized to make, sell, broadcast or otherwise exploit such audio-visual materials unless ARTIST first offers to enter into an agreement with COMPANY as provided in the first sentence of this subparagraph 22(f).  COMPANY will not be required, as a condition of accepting any offer made to COMPANY pursuant to this subparagraph 22(f) to agree to any terms or conditions which cannot be fulfilled by COMPANY as readily as by any other party (for example, but without limitation, the employment of a particular producer or director).

(ii)  If COMPANY does not accept an offer made to it pursuant to this subparagraph 22(f), such non-acceptance shall not be considered a waiver of any of COMPANY'S rights pursuant to this Agreement.  Such rights include, without limitation, the right to prevent ARTIST from exploiting audiovisual material featuring ARTIST in the form of Videoshows, and the right to prevent ARTIST from authorizing any use of masters owned by or exclusively licensed to COMPANY unless COMPANY so agrees.  ARTIST shall not act in contravention of such rights.

(g)  In all other respects (e.g., the times for accountings to be rendered, and warranties and representations made by ARTIST)

Pictures and Video Masters shall be governed by the same terms and conditions as are applicable to masters subject to this Agreement.

21.  For the purpose of this Agreement, the following definitions shall apply:

(a)  "Master" - The equipment of a seven (7") inch 45 rpm single-sided recording of not less than 2-1/2 minutes of playing time intended for use in the manufacture and sale of records.

(b)  "Single" - A seven (7") inch 45 rpm double-sided record embodying thereon two (2) masters.  A "Maxi-single" is twelve (12") inch double-sided record embodying thereon not more than four (4) masters.

(c)  "EP" - A double-sided record embodying thereon either five (5) masters or six (6) masters.

(d)  "LP" - a twelve (12") inch 33-1/3 rpm double-sided long-playing record of not less than 35 minutes of playing time. Multiple sets which consist of more than one (1) LP intended to be released, packaged and sold together for a single overall price shall be deemed to be the equivalent of one (1) LP for the purposes of this Agreement, but shall not be recorded hereunder without COMPANY's prior written consent.

(e)  "Records", "phonograph records", "recordings" and "sound recordings" - All forms of recording and reproduction by which sound may be recorded now known or which may hereafter become known, manufactured or sold primarily for home use, juke box use, or use on or in means of transportation, including, without limiting the foregoing, magnetic recording tape, film, electronic video recordings and any other medium or device for the production or artistic performances manufactured or sold primarily for home use, juke box use or use on or in means of transportation, whether embodying (1 sound alone or (ii) sound synchronized with visual images, e.g., "sight and sound" devices.

(f)  "Delivery", "deliver" or "delivered" - The actual receipt by COMPANY of completed, fully mixed, leadered and edited masters comprising each LPs commercially satisfactory to COMPANY and ready for COMPANY's manufacture of records, together with all materials, consents, approvals, licenses and permissions.

(g)  "Recording Costs" - Wages, fees, advances and payments of any nature or in respect of all musicians, vocalists, conductors, arrangers, orchestrtors, engineers, producers, copyists, etc.; payments to a trustee or fund based on wages to the extent required by any agreement between COMPANY and any labor organization or trustee; all studio, tape, editing, mixing, re-mixing, mastering to tape and engineering costs; all costs of travel, per diems, rehearsal halls, non-studio facilities and equipment, dubdown, rental and transportation of instruments all costs occasioned by the cancellation of any scheduled recording session; and all other costs and expenses incurred in producing the master recordings hereunder which are then customarily recognized as recording costs in the recording industry.

(h)  "mid-priced LP" - An LP which bears a suggested retail list price in the applicable country of the Territory of at least sixty-seven (67% percent but not more than eighty (80%) percent of the suggested retail list price of the majority of COMPANY'S or COMPANY'S licensee's, as applicable, then-current newly-released LPs.

(i)  "budget LP" - An LP which bears a suggested retail list price in the applicable country of the Territory of less than sixty-seven (67%) percent of the suggested retail list price of the majority of COMPANY's or COMPANY's licensee's, as applicable, then-current, newly-released LPs.

(j)  "Pictures" - motion pictures and other audiovisual works that have a soundtrack substantially featuring performances of ARTIST.

(k)  "Videoshows" - Videocassettes, Videodiscs or any other devices, now or hereafter known or developed, that enable the Picture to be perceived visually, with or without sound, when used in combination with or as part of a piece of electronic, mechanical or other apparatus.

(l)  "Videodisc" - A disc-type Videoshow that enables the Picture to be perceived visually, with or without sound, through a television-type playback system or device.

(m)  "Videocassette" - A videoshow other than a Videodisc (e.g., a Videoshow in the form of a pre-recorded tape).

(n)  "Video Masters" - Master Videoshows.

(o)  "Video Net Receipts" - Monies earned and received by COMPANY from exploitation of Pictures less a twenty (20%) percent gross distribution fee (if actually incurred by the COMPANY), and less any out-of-pocket expenses, payments to any music publisher, copyright, union and other third party payments, taxes and adjustments borne by COMPANY in connection with such exploitation and collection and receipt by COMPANY of such monies.

22.  COMPANY shall have the right to assign this Agreement in whole or in part to any subsidiary, parent company, affiliate or to any third party acquiring a substantial portion of COMPANY'S assets or stock.

-22-

23. Notwithstanding any provision to the contrary herein, ARTIST shall have the right to perform as the producer of or as a so-called non-featured "back-up musician", "background vocalist" or "side man" with featured artists for the purpose of making phonograph records for third parties only upon the followinmg conditions:

(a)   ARTIST'S activities in this regard will not in any way interfere with the prompt and timely performance of the recording and delivery obligations provided in this agreement;.

(b)   ARTIST shall give COMPANY written notice thereof in advance and the compositions to be performed and recorded shall not be compositions recorded pursuant to this Agreement;

(c)   ARTIST shall not in any manner restrict himself from thereafter performing the same compositions for COMPANY;

(d)   ARTIST shall not receive more than twice the applicable minimum union scale payment for any such performances;

(e)   if any such records are released in album, ARTIST'S name may only be used in the liner of such album in a size, prominence, and typestyle as customary in the recording industry for the name of such non-featured "back-up musicians", "background vocalists" and "sidemen" whose performances are used and who are given credit on such album and in the same place on the liner where all other such non-featured performers are listed and COMPANY shall be given appropriate courtesy credit in connection with any use of ARTIST'S name on the liner of such album;

(f)   ARTIST shall not perform any step-outs, solos of more than fifteen (15) seconds or duets in connection with such master recordings; and

(g)   except as otherwise provided above, ARTIST's name, likeness or photograph shall not be used in any manner by any third party in connection with ARTIST's performance or in any advertising thereof.   ARTIST's performance may not be used in any manner in connection with "sight and sound" devices.

24.   (a)   This Agreement is intended to bind the individuals listed on the first page hereof jointly and individually.   Accordingly, whenever the word "ARTIST" is used in this Agreement, it shall mean, except as is expressly otherwise provided for herein said individuals jointly and individually, except that all payments to ARTOST shall be made to ARTIST jointly.

(b)   It is the intention of ARTIST that the individuals comprising ARTIST shall, for so long as this Agreement shall be in effect, will perform together as a group (the "Group") for COMPANY. If any individual comprising ARTIST refuses, neglects or fails to perform togehter with the other individuals comprising ARTIST in fulfillment of the obligations agreed to be performed under this Agreement or leaves the Group, ARTIST shall give COMPANY prompt written notice thereof.   Said individual shall remain bound by this

-23-

Agreement, including, but not limited to, the proisions of subparagraph 24(c) hereof or COMPANY, by notice in writing, (i) terminate this Agreement in its entirety without any obligation as to unrecorded or undelivered masters. The individual whose engagement is so terminated may not perform for others for the purpose of recording any selection as to which the applicable restrictive period specified in Paragraph 4 of this Agreement has not expired. Any member of the Group who refuses, neglects or fails to perfrom with the Group or who leaves the Group shall not thereafter use the professional name of the Group in any commercial or artistic endeavor; said professional name shall remain the property of those members of the Group who continue to perform their obligations hereunder and whose engagements are not terminated. The person, if any, engaged to replace the individual whose engagement is terminated shall be mutually agreed upon by COMPANY and the remaining individuals comprising ARTISt. Neither party shall unreasonably withhold agreement with regard thereto; and, if agreement cannot be reached, COMPANY may terminate this Agreement by notice in writing. In the event that an individual engagement is terminated by notice from COMPANY, or by mutual covenant, (i) each party shall be relieved and discharged from liability for masters unrecorded at the time of such notice or mutual consent and (ii) ARTIST will be solely responsible for and shall pay all monies required to be paid to any individual whose engagement is so terminated in connection with all masters theretofore or thereafter recorded under this Agreement and ARTIST will hold COMPANY harmless with respect thereto. Each person added to ARTIST, as a replacement or otherwise, shall become a party to this Agreement as a condition precedent to being so added.

(c)   In addition to the rights provided in the preceding subparagraph 24(b), COMPANY shall have, and each individual comprising ARTIST hereby grants to COMPANY, an irrevocable option for the individual and exclusive services of such individual(s) comprising ARTIST for the prupose of making phonograph records. Said option with respect to such individual(s) may be exercised by COMPANY giving such individual(s) notice in writing within three (3) months after COMPANY receives the notice provided for in subparagraph 24(b) to the effect that such individual(s) comprising ARTIST or that such individual(s) has left the Group or that the Group has disbanded. In the event of COMPANY's exercise of such option, such individual(s) shall be deemed to have entered into a new and separate agreement with COMPANY with respect to such individual(s) exclusive recording services upon all the terms and conditions of this Agreement except that:  (1) the initial period shall be for a period of one (1) year from the date of COMPANY's exercise of such option with an additional number of options granted to COMPANY to extend the term of such agreement for additional consecutive one (1) year periods equal to the number of years then remaining upon this Agreement, but in no event less than three(3) additional years, which options shall be exercised by COMPANY giving notice to such individual at any time prior to each applicable anniversary date; (ii) the minimum recording and deliver obligation shall be one (1) LP per period; provided, however, that COMPANY shall have the right to request additional sides up to one (1) LP during each period; (iii) the provisions contained in subparagraph 7(b) and subparagraph 8 and subparagraph 10(a) of this Agreement shall not be applicable; (iv) COMPANY shall advance all recording costs in

respect to masters to be recorded by each individual up to the amount of the budget approved by COMPANY therefor; (v) COMPANY's royalty obligation to such individual in respect of such recordings shall be the payment to such individual of the royalties computed as set forth in this Agreement except that the Basic U.S. Singles Rate shall be six (6%) percent and the Basic U.S. LP Rate shall be ten (10%) percent with royalties for all other uses (foreign sales, clubs, licensing, etc.), reduced proportionately; (vi) COMPANY shall maintain separate accounts with respect to recordings subject to this Agreement and those embodying the performances of such leaving individual. However, such leaving member's account with COMPANY shall be debeted with a sum equal to two times the leaving individual's pro-rata phase of ARTIST'S unrecouped balance as of the close of the accounting period following his leaving ARTIST and ARTIST'S account shall be credited with an identical amount. By way of illustration only, if ARTIST is comprised of five (5) members and one (1) member leaves when the ARTIST'S account with COMPANY has an unrecouped balance of Fifty Thousand Dollars ($50,000) then the leaving individual's account with COMPANY shall be unrecouped in the sum of Twenty Thousand Dollars ($20,000) and ARTIST'S account with COMPANY shall be deemed unrecouped in the sum of Thirty Thousand Dollars ($30,000); and (vii) recordings by such individual shall not be applied in diminution of ARTIST's minimum recording committment as set forth in this Agreement.

(d)   No changes in the individuals comprising ARTIST may be made without COMPANY's prior written consent which consent shall not be reasonably withheld.  ARTIST shall not have the right, so long as this Agreement is in effect, to assign ARTIST's professional name as mentioned on Page 1 hereof (or any other name(s) utilized by Artist in connection with recordings subject hereto) or to permit the use of said name(s) by any other individual or group of individuals without COMPANY's prior written consent, and any attempt to do so shall be null and void and shall convey no right or title.  The individuals comprising ARTIST jointly and severally represent and warrant that they are and shall be the sole owners of all such professional name(s), and that no other person, firm or corporation has the right to use said mane(s) or to permit said name(s) to be used in connection with phonograph records, and that the individuals comprising ARTIST have the authority to grant COMPANY the exclusive right to use said name(s) in the Territory.  COMPANY shall have the exclusive right to use said name(s) in accordance with all of the terms and conditions of this Agreement.

25.   Intentionally omitted.

26.   This Agreement shall be deemed to have been made in the State of New York and its validity, construction, performance and breach shall be governed by the laws of the State of New York applicable to agreements made and to be wholly performed therein. ARTIST agrees to submit to the jurisdiction of the Federal or State Courts located in New York City in any action which may arise out of this Agreement.

27.   This Agreement shall not become effective until it is executed by all parties.

IN WITNESS WHEREOF, the parties hereto have executed this
Agreement on the day and year first above written.

MEGAFORCE RECORDS, INC.

BY: _____
BILLY MILANO p/k/a
BILLY MASSIE

_____
TOM McMURTRIEn

_____
KEN BALONE

_____
KEITH DAVIS

p/k/a "Method of Destruction"

# EXHIBIT B

04/13/2018   04:22PM   15124445848                    STONY CREEK                              PAGE   01/01

## TRADEMARK ASSIGNMENT

This TRADEMARK ASSIGNMENT (the "Assignment") made this _13th_ day of April, 2018, by and between William John Massie, an individual and citizen of the United States with an address of c/o Megaforce Records, 89 5th Avenue, #600, New York, New York 10003 ("Assignor") and Megaforce Records, Inc. a New York corporation with a mailing address of 89 5th Avenue, #600, New York, New York 10003 ("Assignee").

### WITNESSETH

WHEREAS, Assignor is the owner of all right, title and interest in and to United States Trademark Application No. 87/493,541 for the mark M.O.D. METHOD OF DESTRUCTION in Class 9 for *series of musical sound recordings; downloadable musical sound recordings; musical video recordings; downloadable musical video recordings; audiovisual recordings; downloadable audiovisual recordings* (hereinafter the "Applied-For Mark");

WHEREAS, Assignor is the owner of all right, title and interest in and to: (i) the name and mark M.O.D. METHOD OF DESTRUCTION; (ii) the name and mark M.O.D; (iii) the name and mark MOD; and (iv) the name and mark METHOD OF DESTRUCTION, all in connection with music and band related goods and services, including but not limited to musical recordings, live performances and merchandise (hereinafter the "Common Law Marks" and, together with the Applied-For Mark, collectively, the "Marks");

WHEREAS, Assignor has agreed to assign all rights in and to the Marks to Assignee, and Assignee has agreed to acquire all rights in and to the Marks, including any and all common law rights in and to said Marks, and any and all registrations that may result therefrom.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby assigns to Assignee all right, title and interest throughout the world in and to said Marks, together with: (i) all of the goodwill symbolized by said Marks; and (ii) the right to recover damages and profits and all other remedies for past and future infringements of the Marks.

IN WITNESS WHEREOF, Assignor has caused this Assignment to be duly executed as of the day and year first above written.

ASSIGNOR:

William John Massie